

GROVER SELLERS
~~PRICE DANIEL~~L
ATTORNEY GENERAL

# OFFICE OF
# THE ATTORNEY GENERAL
## AUSTIN, TEXAS

Honorable Bascom Giles
Commissioner, General Land Office
Austin, Texas

Dear Sir:

Opinion No. O-6233
Re: Authority and duty of
Commissioner of General
Land Office under Sec. 4a
of House Bill No. 9, Acts
of 46th Legislature, 1939,
to examine and approve,
before filing, lease on
lands subject to provisions
of Relinquishment Act, and
related questions.

We have your letter of recent date in which you request this department to advise you on the following questions:

"1. The extent of the authority conferred on the Commissioner of General Land Office by virtue of the enactment of Sec. 4a of H. B. 9, Acts of 46th Legislature, 1939.

"2. Does Section 3 of the Oil and gas leases submitted to you as required by Sec. 4a of H. B. 9 (Art. 5421c-2) conflict with the provisions of the Relinquishment Act?"

In connection with your first question we have studied the construction your department has given this Act and the practice you have followed in administering it. That part of your letter setting out your departmental construction and practice is as follows:

"Section 4-a of House Bill No. 9, passed by the 46th Legislature, 1939, provides:

Hon. Bascom Giles, Page 2

'No mineral lease executed by an owner or owners of land or minerals under what is commonly known as the Relinquishment Act shall be effective until a certified copy of such lease is filed in the Land Office. No such lease executed after the effective date hereof shall be binding upon the State unless it recites the actual and true consideration paid or promised therefor.

'Prior to the passage of this Act, the General Land Office employed investigators to inspect the County Records to determine what was due the State on oil and gas leases executed on lands subject to the Relinquishment Act. This practice was necessary, because, being without any legal necessity of filing such leases in the Office, the landowners and lessees in a great many instances did not bother themselves with seeing that the State ever got its share of the bonus, rentals, and royalties. In many instances, the leases prior to the passage of House Bill No. 9 in 1939 had terms in them in conflict with the provisions of the Relinquishment Act, and failed to state the actual and true bonus consideration. Abuse of this sort was common and resulted in depriving the Permanent School Fund of much revenue.

'The work of the above mentioned investigators brought to light many instances when the Permanent School Fund had been deprived of funds, and such cases were called to the attention of the Attorney General. Sensing the need for reform, I recommended to the 46th Legislature the passage of Section 4-a of House Bill No. 9 and they, realizing the merit and necessity of such law, passed same. The State needed the assistance of this law to protect the Permanent School Fund and to aid in the collection of funds from the leases of mineral estates dedicated to that Fund.

'Since the passage of Section 4-a, this department has examined all oil and gas leases tendered for filing in this office and executed on lands subject to the provisions of the Relinquishment Act. When such a lease is tendered for filing it is examined carefully. It is examined to determine the amount of bonus and rentals to be paid the State. The length of the primary term of the lease is considered. The other bargaining provisions are considered with special note being taken

whether the leases have any provisions contrary
to the Relinquishment Act. When I use the term
"Relinquishment Act", I not only refer to the Act
itself, but also to the court decisions, con-
struing the Act. Then, too, the copy of the lease
tendered for filing is examined as to whether or not
it is a certified copy as required by Section 4-a,
All this is done with a sense of duty on my part
to safeguard the interest of the State and to see
that the Permanent School Fund gets such funds to which
it is entitled.

"If, after an examination of such lease, I
find that the bonus and rentals to be paid the State
are satisfactory and in line with what other leases
are bringing in the same locality, that the lease
has no provisions contrary to the Relinquishment
Act, and that a certified recorded copy of the lease
is tendered for filing, then, I file the lease, apply
the State's one-half of the bonus payment and notify
the party tendering the lease of the filing of same,
and the State lease number assigned to it. I also give
a receipt for the bonus received by the State. How-
ever, in no instance do I file a lease until I have
received the State's share of the bonus consideration.

"Whenever I find that lease should not
be filed because it does not conform to the re-
quirements set out above, I hold the lease and bonus
payment in suspense and notify the party tendering
the lease for file of my objections. I ask the
party to re-execute the lease in some instances and
have the new lease comply with the requirements of
the Relinquishment Act. Whenever I deem the bonus
consideration low, I advise the party to that effect
and ask for an explanation why such lease should not
be worth more money. Cooperation is usually secured,
and, after I am satisfied that the above requirements
have been met, I approve and file the lease.

"It is the construction of this department
that the Commissioner of the General Land Office has
the authority as well as the duty under Section 4-a
of House Bill No. 9 to examine leases executed on
lands subject to the Relinquishment Act and tendered
for filing in this office; and that he must approve

such leases as to the bonus and rental consideration to be paid the State, as to the other provisions in the leases, and as to the length of the primary term of the leases. In other words, the Commissioner must approve the lease as a whole before he files it in the General Land Office, and prior to such approval and filing the lease is ineffective insofar as the State is concerned.

"This departmental construction is placed upon Section 4-a not with a desire to coerce the landowner and lessee into a lease that is detrimental to their interests, but with an earnest desire to protect the Public free school fund. The great majority of leases tendered for filing in this office are satisfactory and secure my immediate approval, whereupon they are promptly filed. Most landowners and lessees are aware of the provisions of the Relinquishment Act and the policy of this office, and cooperate with me in these matters. And most landowners and lessees comply with my requests for any changes in leases as to the bonus and rental consideration, and provisions that are in conflict with the Relinquishment Act. Only in a relatively few instances have I failed to secure cooperation from the landowner and lessee which resulted in a deadlock and where I was unable to proceed further."

The Supreme Court of Texas in the recent case of Burroughs v. Lyles, 181 S. W. (2) 570, ruled that long administrative construction of a statute is entitled to great weight in determining the effect to be given it. This rule of law should be particularly applicable here as the Act under discussion was enacted by the Legislature following your recommendation to that body that such a law was needed in order that the State's interest might be better protected.

To hold that the Act made it your duty to file oil and gas leases without first examining and approving them would defeat its very purpose. It is the opinion of this department that your construction of the Act is correct, and your practice in examining and approving leases before filing is proper.

Following your departmental construction of Section 4-a of H. B. 9, you have refused to approve and file several oil and gas leases submitted to you for the reason that it is your opinion Section 3 of the lease is contrary to the provisions of the Relinquishment Act.

Section 3 of the leases is as follows:

Hon. Bascom Giles, Page 5

"3. Royalties to be paid by lessee are: (a) One-sixteenth of the value of all oil and gas produced and saved from said land to be paid to the Commissioner of the General Land Office for the State of Texas, at Austin, Texas; (b) one-sixteenth of the value of all oil and gas produced and saved from said land to be paid to Lessor individually. Where gas from a well capable of producing gas only is not sold or used, Lessee may pay as royalty Fifty Dollars ($50.00) per well per year to said Commissioner of the General Land Office for the State of Texas and a like amount to Lessor individually, and upon such payments it will be considered that gas is being produced within the meaning of Paragraph 2 hereof."

Section 2 of the lease is as follows:

"Subject to other provisions herein contained, this lease shall remain in force for a term of ten years from this date, called primary term, and as long thereafter as oil or gas is produced from said land, or as long thereafter as Lessee shall conduct drilling or reworking operations thereon with no cessation of more than sixty consecutive days until production results, and if production results, so long as oil or gas is produced."

The Relinquishment Act is codified in Vernon's Annotated Civil Statutes as Articles 5367 and 5368. Article 5368 is involved here and is as follows:

"The owner of said land is hereby authorized to sell or lease to any person, firm or corporation the oil and gas that may be thereon or therein upon such terms and conditions as such owner may deem best, subject only to the provisions hereof, and he may have a second lien thereon to secure the payment of any sum due him. All leases and sales so made shall be assignable. No oil or gas rights shall be sold or leased hereunder for less than ten cents per acre per year plus royalty and the lessee or purchaser shall in every case pay the State ten cents per acre per year of sales and rentals; and in case of production shall pay the State the undivided one-sixteenth of the value of the oil and gas reserved herein, and like amounts to the owner of the soil."

The Supreme Court of Texas in the case of Greene v. Robison, 8 S. W. (2) 655, and other cases, upheld the constitutionality of the Relinquishment Act, and interpreted

Hon. Bascom Giles, Page 6

it to mean that the landowner was made the Agent of the State
for the purpose of executing oil and gas leases on lands sold
subject to the Act, the agent and the State to share equally
the bonus, rentals and royalties, except the State reserved to
itself a minimum 1/16 free royalty and ten cents per acre
minimum rental. The agent could contract for a royalty, one-
half of which could be more than 1/16 xxxxxxxxxxxxxxxxxxxx
to the State, but he could not contract for a lesser amount to
the State.

The authority of the agent under this Act is
broad, and the term ". . . upon such conditions as such
owner may deem best, subject only to the provisions hereof,"
has never been and cannot be defined with certainty since each
lease contract must stand upon its own terms. However, with
respect to the authority of the agent and type of lease he is
authorized to execute, the San Antonio Court, speaking through
Judge Murray, in the case of State v. Magnolia, 173 S. W. (2),
186 (writ refused), said:

"We feel that when the entire Relinquish-
ment Act is considered and especially in the light
in which it has heretofore been construed, it was
never intended that the surface owner should execute
a deed absolute to the oil and gas in and under the
land, but only an ordinary commercial lease, which
provides for delay rentals unless and until oil is
produced in paying quantities. . . ."

We interpret the opinion as limiting the authority
of the agent to the making of an ordinary commercial oil and gas
lease, providing for a term of years not in excess of the usual
and customary term as practiced in the oil industry, for
delay rentals, and in case of production, as long thereafter
as oil or gas is produced from the land.

The term "produced" as used in the ordinary
lease, and as is used in Section 2 of the leases before us,
has been defined by the Supreme Court in the case of Garcia
v. King, 164 S. W. (2) 509, to mean the actual production
of oil and gas in paying quantities. Paying quantities was
defined to be sufficient production for the lessee or operator
to make a profit from the operation of the lease. The amount
considered to be in paying quantities is left to the judgment
of the operator, when such judgment is exercised in good faith.

The court in the case of Garcia v. King, approved
the holding of a case arising in Tennessee in which the effect
of the word "produced" as used in an ordinary commercial lease.
We quote from the opinion as follows:

"In the Benedum-Trees Oil Co. v. Davis, 107
F. 2nd 981, 985, a case arising in Tennessee, the
lessee completed a well producing gas but no oil,

Hon. Bascom Giles, Page 7

and capped it for want of a market. Interpreting the lease, the Sixth Circuit Court of Appeals said:

"'The leases here in question were for five and one years respectively and "as long there- after as oil or gas or either of them is produced from the land by the lessee." There is absent from them the exact language that gas or oil must be produced in "paying quantities". However, in ar- riving at the intent of the parties, this is im- plied because they contracted with the end in view that the business would be profitable to both lessor and lessee. The latter may have realized a gain by retaining the leases for speculation. The former could receive no benefit from them except by mar- keting gas from the premises. . . .

"'The term "paying quantities" involves not only the amount of production, but also the ability to market the product at a profit.'"

The lease involved in the Tennessee case did not contain the terms found in Section 3 of the leases before us in this opinion. We recognize that private parties may enter into a lease contract that does contain these terms, and which would make the cases cited above inapplicable. We have used these cases in an effort to determine the effect of the usual and ordinary commercial oil and gas lease that did not have in them such provisions as is found in Section 3 of these leases. The terms found in Section 3 of these leases are of relatively recent origin, and were not commonly used at the time the Relinquishment Act was enacted.

The mineral laws of Texas as they relate to pub- lic lands have consistently followed the policy of securing the development of the State's minerals. By development we mean the actual production and sale of the minerals in order that the funds to which the lands are dedicated might have the use of the revenue resulting therefrom. The principal purpose of the Relinquishment Act was to secure the coopera- tion of the surface owner in promoting the development of these resources.

As stated in the case of State v. Magnolia, supra, in leases executed subject to the provisions of the Relinquishment Act, it is contemplated that they be the usual and ordinary commercial leases, providing for a definite term of years, unless and until oil or gas is produced in paying quantities, then as long thereafter as actual production continues. The right to substitute the payment of $50.00 per well per year on a gas well, where the gas is not used or sold, for actual production, and such payment to be called production, thus continuing the lease in force and effect by reason of production over an indeterminable period, is one not

Hon. Bascom Giles, Page 8

contemplated by the Relinquishment Act. The Act contemplates the lease to be continued in effect by reason of actual production and the payment of 1/16 free royalty to the trust fund. Such a provision could operate to retard the development of the State's mineral resources.

The Supreme Court in the case of Empire Gas & Fuel Co. v. State, 47 S. W. (2) 265-272, stated a rule of law which we consider applicable here:

"The rule is also well settled that legislative grants of property rights and privileges must be construed strictly in favor of the State on ground of public policy, and whatever is not unequivocally granted in clear and explicit terms is withheld. Any ambiguity or obscurity in the terms of the statute must operate in favor of the State."

Certainly the Relinquishment Act is obscure and ambiguous in many respects. And in spite of the many court decisions construing the Act as it applies to given circumstances, it will, no doubt, continue to be subjected to further construction as different questions arise in the future. In the instant case the rule stated above seems particularly applicable since the rights granted in the leases are calculated to operate in favor of the lessee, and certainly there is the possibility of it operating to the detriment of the State.

Accordingly, you are advised that it is the opinion of this department that Section 3 of the leases in question is contrary to the provisions of the Relinquishment Act and you are correct in your refusal to approve and file them.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By /s/ Jack W. Rowland
Assistant

JWR:BT:jrb

APPROVED OCT. 31, 1944
/s/ Carlos C. Ashley
FIRST ASSISTANT
ATTORNEY GENERAL

and egt-(pp.1-4)

APPROVED OPINION COMMITTEE
BY BWB, Chairman